RECEIPT # k 3671 w
AMOUNT $ 250
SUMMONS ISSUED X—'
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. m
DATE 4-20-05

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MASSACHUSETTS

IMAGINEIGHT ENTERTAINMENT )
INC., and ALPHA CREATIONS, INC., )
and DANIEL LUNDQUIST, and LORI )
LUNDQUIST, and JOHN and EMILEY )
GAMES, and JILL and JAY HARRIS, )
)
       Plaintiffs, )
)
     v. )
)
NORTH AMERICAN COMMERCIAL )
HOLDINGS, LLC, a domestic company )
duly organized and existing under the laws )
of the Commonwealth of Maryland, )
)
    and )
)
WORLD WIDE COMMERCIAL )
FUNDING, a foreign company duly )
organized and existing under the laws )
of the State of Oklahoma, )
)
    and )
)
JOSEPH MERENDA, individually as a )
citizen and resident of Middlesex, )
Massachusetts, and in his capacity as )
CEO and President of North American )
Commercial Holdings, )
)
    and )
)
BETTY SOLOMON, a citizen and resident )
of Oklahoma City, Oklahoma, and in her )
capacity as Director of World Wide )
Commercial Funding, )
)
    and )
)
MARTIN G. TAYLOR, a citizen and )
Resident of Dallas, County, Texas, )
)
    and )
)
GARY JEFFERSON, a citizen and resident )

## 05 - 10790 PBS

MAGISTRATE JUDGE Alexander

Case No.:_____
JURY TRIAL REQUESTED

of Missouri City, Texas, as President of    )
Access Global Funding    )
    )
         and    )
    )
DARRELL SOLOMON, a citizen and    )
resident of Oklahoma City, Oklahoma and    )
in his capacity as Chief Financial Officer    )
and President of World Wide Commercial    )
Funding, and as Vice President of North    )
American Commercial Holdings, LLC    )
    )
         and    )
    )
JOHN R. ABBOTT, individually as a    )
citizen  and resident of Sagamore Beach,    )
Massachusetts and as Vice-President of    )
Investments and Asset  Allocation of North    )
American Commercial Holdings, LLC,    )
    )
         and    )
    )
WALTER GORMLEY, individually as a    )
Citizen and resident of Massachusetts    )
and as a member of North American    )
Commercial Holdings, LLC    )
    )
         and    )
    )
TIM POPE, individually as a citizen and    )
resident of Mustang, Oklahoma    )
and as a member of North American    )
Commercial Holdings, LLC    )
    )
    )
         Defendants.    )
_____)

## COMPLAINT

Now Comes the Plaintiffs, individually and collectively, by and through counsel, and for cause

of action would state as follows:

## PARTIES

1.      Plaintiff **Imagineight Entertainment** is foreign company organized and existing under the laws of the State of Texas. Imagineight Entertainment has an ID number with the Texas Secretary of State of 800214138. Imagineight has a principal place of business located in Murphy Texas. The billing address is P.O. Box 1310, Helotes, TX 78023. The mailing address is 127 Shanandoah Ln Murphy, Texas 75094.

2.      Plaintiff **Alpha Creations** is foreign company organized and existing under the laws of the State of Texas. Alpha Creations has an ID number with the Texas Secretary of State of 800335618. Alpha Creations has a current principal place of business located at 127 Shanandoah Lane, Murphy, Texas 75094.

3.      Plaintiff **Daniel and Lori Lundquist** are citizens and residents of Bexar County, Texas and reside at 10809 Westwood Loop, Apt 217, San Antonio TX 78254.

4.      Plaintiff **Jill and Jay Harris** are citizens and residents of St. Charles County Missouri and reside at 2026 Willowshade Court, St. Peters, MI 63376.

5.      Plaintiff **John and Emiley Games** are citizens and residents of Marion County, Ohio and reside at 1134 Thomas Drive, Marion, OH 43302

6.      **Anthony and Melisa Moore** are citizens and residents of Collin County, Texas and reside at 127 Shanandoah Lane, Murphy, Texas 75094.

7.      Defendant **North American Commercial Holding, LLC** is a Limited Liability Company organized and existing under the laws of the State of Maryland. Defendant North American Commercial has an ID number with the Massachusetts Secretary of State of 900123415. North American has a current principal place of business located at 675 V.F.W. Parkway, Suite 103 Boston, Massachusetts 02467 and may be served via their registered agent, Joseph Merenda at 675 V.F.W. Parkway, Suite 103 Boston, Massachusetts 02467.

8.      Defendant **World Wide Commercial Funding** is an Oklahoma corporation with a principal place of business located at 14708 South May Ave., Oklahoma City, Oklahoma 73170, and may be served via their registered agent, Darrel Solomon, at their principle place of business. World Wide Commercial Funding has an ID number with the Oklahoma Secretary of State of 1900698550.

9.      Defendant **Joseph Merenda** is citizen and resident of the Commonwealth of Massachusetts and may be served at his principal place of business of at 675 V.F.W. Parkway, Suite 103 Boston, Massachusetts 02467.

10.     Defendant **Betty Solomon** is a citizen and resident of Oklahoma County, Oklahoma and resides at 14708 South May Ave., Oklahoma City, Oklahoma 73170.

11.     Defendant **Martin G. Taylor** is a citizen and resident of Dallas County, Texas and resides at 7155 Fair Oaks Avenue #26, Dallas, Texas 75231.

12.     Defendant **Gary Jefferson** is a citizen and resident of Texas and has a mailing address of P.O. Box 803, Missouri City, Texas 77459.

13.     Defendant **Darrell Solomon** is a citizen and resident of Oklahoma County, Oklahoma and resides at 14708 South May Ave., Oklahoma City, Oklahoma 73170.

14.     Defendant **John R. Abbott**, is as a citizen and resident of Sagamore Beach, Massachusetts and as Vice-President of Investments and Asset Allocation for North American Commercial Holdings, LLC, and has a mailing and residential address of 3 Chariott Xing, Sagamore Beach, MA 02562

15.     Defendant **Walter Gormley**, is as a citizen and resident of Massachusetts and is a member of North American Commercial Holdings, LLC, and may be served at his place of business with North American Commercial Holdings, LLC at 675 V.F.W. Parkway, Suite 103 Boston, Massachusetts 02467

16.    Defendant **Tim Pope**, is as a citizen and resident of Oklahoma City and as the Legislative Liaison and Corporate Marketer for North American Commercial Holdings, LLC, and has a mailing address and residential address of 517 N Lakeside Ter., Mustang, Oklahoma 73064.

## JURISDICTION AND VENUE

17.    The jurisdiction and venue of this Honorable Court arise from the fact that the acts, omissions and the nucleolus of the business transactions giving rise to this Complaint occurred within Boston, Massachusetts.   The Defendants not residing in Massachusetts are subject to jurisdiction and venue due to their business relations and transactions within the Commonwealth of Massachusetts.

## FACTS

18.    Plaintiff Daniel Lundquist has been intimately involved in the movie theater business for a number of years. He has worked for several of the major movie theater companies throughout the country.  His managing, marketing and promotional skills earned him over a dozen national studio awards, including two ShoWest awards.  Plaintiff Daniel Lundquist has extensive experience establishing theaters and led a team to promote the grand opening events of six major renovated theatres.

19.    Daniel Lundquist helped open the AMC Oak View 24 theatre and demonstrated his passion for movies and interest in educating the community by facilitating and winning many national studio marketing contests. When AMC's internal restructuring resulted in the elimination of local marketing, Mr. Lundquist took the opportunity to gain experience in two smaller independent exhibitors.  In less than two years, Regal Cinemas, the largest film exhibitor in the United States, offered Mr. Lundquist the position of citywide coordinator in San Antonio, Texas. Within six months, Daniel Lundquist was promoted to the home office of Regal Entertainment Group to manage and promote Regal's Central Region, including theatres in Portland, Seattle, Chicago, Dallas,

Houston, San Antonio, Spokane, Austin and Oklahoma City. Mr. Lundquist led a team of regional marketing managers in eight states, which lead to another promotion to promotions manager of the Northern Region, including theatres in New York City, Syracuse, Boston, Philadelphia, Baltimore, Rochester, and Cleveland. After a short few years working for Regal Entertainment Group, Daniel Lundquist began seeking funding to build, operate, promote and market his own theatre company, which was subsequently named Imagineight Entertainment, Inc.

20.    Anthony Moore has owned his own insurance wholesale company for over 20 years. He has won numerous sales awards from several top rated companies. He has managed several hundred agents and helped them to achieve great success. He has worked directly with companies to help develop new products and new markets. He also owned his own water garden company which achieved great success and was known for its quality workmanship. He also has negotiating skills with land developers, economic development centers and city planning offices. He was the precinct chairman for district 121 for a term of 4 (four) years. So he is well versed in political matters.

21.    Daniel Lundquist and Anthony Moore met during the developmental phase of a set design for the opening of the movie Time Machine in January of 2002. Dan Lundquist spoke with Anthony Moore about his vision of opening a new theater chain which would bring a new standard of entertainment to the industry. Anthony Moore, an established business person in the Texas community, discussed possible scenarios by which he would be able to assist Mr. Lundquist in the endeavor. They met in Atlanta again in April of 2003 to further discuss the proposal.

22.    After the meeting of April 2003, Plaintiffs Daniel Lundquist, Lori Lundquist, Anthony Moore and Melisa Moore began considering the possibility of establishing an entertainment company together that would bring back the traditional entertaining and exciting experience of going to the movies, while providing the latest, state-of-the-art technology in film presentation. The Plaintiffs decided to develop this company together and name their corporation

Imagineight Entertainment, Inc. On or about June 3, 2003, Plaintiffs filed the requisite papers with the Texas Secretary of State and formed Imagineight Entertainment, Inc., and immediately began searching for lenders and /or debt or equity investors.

23.    The Plaintiffs planned for Imagineight Entertainment to be the parent company with the individual theaters themselves being named: "Atlantis Stadium 20 Theatres".

24.    The model which the plaintiffs developed was for Atlantis Stadium 20 Theatres to show first-run movies in a high quality, technologically advanced environment, as well as offer traditional concessions. Under current plans, Atlantis Stadium 20 Theatres were to go above and beyond any current theater in terms of comfort in the movie environment. The theaters were designed to have 18" premium stadium seat risers, 50" of extra legroom, digital sound, DLP digital projection and up to 70' wide screens. Each Atlantis 20 theater was designed to utilize more DLP's per theater than any other theater in the country.

25.    Atlantis Stadium 20 theatres were designed to offer traditional movie concessions but in larger sizes at more affordable, more profitable prices and combinations. The superior customer service and a unique, underwater environment would have complimented an economically advantageous patron draw.

26.    In addition, the theatres are designed to utilize space and technology by offering non-traditional opportunities to families, schools, businesses and the community. Families will be able to take advantage of high tech birthday rooms, free kid-oriented events, video gaming tournaments, Monday Night Football, special events and concerts. Students and teachers will benefit from the fundraising programs and special screening opportunities of kid-appropriate/educational films. Businesses will have the opportunity to utilize the theatre space for annual meetings, special seminars and conventions. In addition, it is planned that the Atlantis Stadium 20 theatres will offer free fun kid events, prize giveaways, free popcorn nights, military,

senior and student discounts, as well as opportunities to attend film festivals, movie conventions and other special events

27.    Atlantis Stadium 20 theatres also seek to be an active and giving member of the community by sponsoring charity events, giving charities a platform for exposure and equipping the facility for handicap access and hearing impaired patrons.

28.    During the preliminary projections and studies, Plaintiffs did a comparison of twenty-eight (28) theaters which all had at least twenty (20) screens per theater. The annual national box office yearly average for these 20-screen theatres is $4.69 million per theater so that point in the year. The national box office per year is $6.5 to $7.5 million per year. However, the San Antonio and Dallas areas are projected to well exceed the national averages. By August of 2003, the 2003 yearly receipts for the Cielo Vista Theater 18 in San Antonio made roughly eight million ($8,000,000) box offices gross, and that was with four (4) months remaining in the year, which is significantly above average. Likewise, the AMC 24, in San Antonio at Huenber Oaks made roughly nine ($9,000,000) million per year which is also well above the national average. A theater such as the Atlantis Stadium 20, precisely located, is poised to attract many of their competitor's clientele due to the superior facilities, location, functions and general environment.

29.    Imagineight Entertainment, Inc. has a multi-leveled, yearly promotional schedule plan that benefits from both holiday and summer blockbusters and effectively uses the building in the non-peak months of the year. This will generate revenue that exceeds similarly situated theaters. This plan pursues every opportunity to invite the local communities to the Atlantis Stadium 20 Theatres. Highlights in this plan include the following events: 1) a quarterly film promotion that consists of a three-week window of media and lobby events, concession offers, charity spotlight and more; 2) a semiannual film convention hosted at the theatre including a three-day weekend of movie marathons, seminars, trade shows, panels, question and answer sessions with directors, actors and

others. This multifaceted event will include revenues made on tickets purchased to enter convention, booth sales and additional concession sales; and 3) sponsorship of pay-per view events, Monday Night Football, concerts and other televised events such as NCAA basketball Final Four, Super Bowl, World Series, etc.

30.    Due to the Plaintiff's studies, designs, planning and foresight, the Atlantis Theaters are projected to far exceed the net gains of similarly situated theaters. In fact, Imagineight Entertainment will push the theater industry to such a new level that they cannot be compared to other theaters and, therefore, cannot be simply and quantifiably compared to similarly situated theaters as they are projected to generate a much larger profit.

31.    The movie theatre industry's largest revenue stream is generated from concession sales. Theatres' per head expenditures measure concession sales. Although each theatre sells relatively the same type of product, popcorn, candy and drink, each theatre's per head differs due to the marketing and training provided to the employee. It is planned that the Atlantis Stadium 20 theatres will not only benefit from strong training and education, but with highly effective marketing techniques, campaigns and combo specials, for which Daniel Lundquist has excelled in the industry, but it is projected that the Atlantis Stadium 20 will have a higher than average per head resulting in higher revenues.

32.    The average moviegoer is one with high disposable income and age eighteen to forty-six (18-46). The various theater sites were carefully considered and selected through meticulous studies and empirical data. For example, each proposed theater site in San Antonio, Texas, thrives on abundant and growing population of target audience age demographics (Average 30.9 years) with above average disposable income. In addition, each site boasts a successful business community of tourism, industry and blue-collar employment. The Sea World site in San Antonio, Texas, will have certain advantages, such as being across the street from Sea World (with 3 million in

annual attendance) and being located just up the street from the largest growing college in San Antonio. The second proposed San Antonio, the 281 site, has advantages of being the most northern theatre in San Antonio, serving residents outside the region, as well as the throughout the city limits. The 281 site also boasts the second highest growth rate region of San Antonio with over 15,000 homes that will be finished within the 2004 year.

33.    As part of the Plaintiffs' concepts and business plan for Imagineight Entertainment, they planned to develop the properties upon which the theaters were located using "pad sites" to lease to businesses which generally are compatible to movie audiences, such as the food industry. Imagineight Entertainment, Inc., would have generated substantial revenues from the property developments as an additional supplement to the Atlantis 20 theaters. On or about April 27, 2004, Plaintiffs filed the requisite papers with the secretary of state and formed "Alpha Creations", which would handle all the commercial properties (pad sites) and transactions related thereto.

34.    The summer of 2005 is expected to generate the largest summer movie revenues in to date. Due to the high number of large budget releases, the 2005 summer blockbuster season will start earlier than usual with the openings of State of the Union staring Vin Diesel and Ridly Scott's Kingdom of Heaven staring Orlando Bloom which will open in April and May respectively. Immediately following these anticipated blockbusters will be Star Wars Episode III and the Batman prequel during the month of May. These "summer blockbusters" have been scheduled for release prior to the typical summer season even beginning. Under the initial plans to have the theaters open for these movies in April-May of 2005, the latest possible date for which the funding could be obtained by the Plaintiffs was in late June or early July of 2004. The Plaintiffs anticipated that a closing date as late as July of 2004 would greatly complicate matters, but that Imagineight could progress and meet their objectives so long as the funding was completed by that time.

35.    Plaintiffs began seeking funding for their projects during the summer of 2003. They spoke with numerous banks and other various lending institutions about possible scenarios for obtaining funding.

36.    On or about September 1, 2003, Plaintiffs began negotiations with various brokers and lenders, presented their business plan, and began organizing the companies' financial footing as well as conducting feasibility studies, mapping current theater locations, etc.

37.    As part of their business plan, and based on solid ascertainable accounting figures and practices, Imagineight Entertainment expected to generate approximately $26 million in revenue in the first full year with the opening of four theatre builds. After the first year of opening, revenues were projected to increase to a full potential revenue plateau within five (5) or six (6) years, in addition to expansion of additional theater sites.

38.    Alpha Creations, Inc., expected to generate significant amounts of money from their pad sites. According to preliminary reports and projections, the Sea World site could make three to four hundred thousand ($300,000-$400,000) per site. The 281 site could make two to three (2-3) million. The Garland site would make about three million ($3,000,000) for the sites. The Allen site is still undeterminable at this point due to the fact that the property was lost due to a deficiency in the Plaintiff's creditability after continued promises to the sellers of a closing to obtain financing for the purchase, and the failure thereof. Additionally, Plaintiffs lost all creditability and the potential of future development with the Jud Heflin with Blue Star Development, a division of the Dallas Cowboys, who had various other potential properties for sale.

39.    When the Plaintiffs lost the various properties due to Defendants actions and omissions, in addition to the loss of the site itself, the plaintiff's also the benefit of many hours worked in order to secure incentives for the properties. Examples of the incentives for the Allen site are: 1) the city was waving all permitting and impact fees, 2) the City and give tax credits up to

one-million dollars, and 3) Blue Star Development was also going to pay for all curb cuts, landscaping and the parking lot. The City of Garland, Texas was offering Imagineight identical incentives for develop on the Garland site.

40.     Anthony and Melisa Moore met Martin G. Taylor when he processed their home loan in or around June 2003. When the Plaintiffs put their business plan together, Martin Taylor stated that he could get the loan processed with some people. After discussions with several potential persons, Martin Taylor referred the Plaintiffs to Gary Jefferson.

41.     During late January or early February, Plaintiffs met in San Antonio to view properties, meet with a potential construction company, etc.

42.     During late February of 2004, Anthony Moore received news through Mr. Taylor that Mr. Jefferson had contact with a potential lender through someone known as Ms. Betty Solomon. Gary Jefferson said he could get the funding for Imagineight through Betty Solomon, who was vice-president of World Wide Commercial Funding. Martin Taylor then setup a meeting between Betty Solomon and the Plaintiffs. The Plaintiffs forwarded all the information they had regarding Imagineight, including their business plan, to Betty Solomon.

43.     During the initial dealings with Betty Solomon, she indicated that she had years of experience in lending and that she had funded hundreds of loans such as the one which Imagineight was seeking. Ms. Solomon informed the Plaintiffs that she was directly involved with the lender. Ms. Solomon additionally stated that she previously worked with Joe Meranda for many years as a broker and now is the exclusive agent, facilitator and advisor for North American. In fact, she emphasized that her son, Darrel Solomon, who was also part of World Wide, was actually on the Board of Directors of North American. Ms. Solomon stated and indicated that, due to her close relations with the lender, she could provide an expedited lending process, that the process itself

would be less cumbersome, and that World Wide would provide high quality services than any other broker or lender.

44.    After reviewing the business plan and projections, Ms. Solomon quickly responded indicating that everything looked great and that she would get back with the Plaintiffs very soon with paper work, etc.

45.    Plaintiffs went to Oklahoma City and met with Betty Solomon and Darrell Solomon. During the meeting, Betty Solomon and Darrell Solomon stated that they were very excited about the project and felt the lender would share their feelings and that the loan should be quickly processed with a closing shortly thereafter.    Martin Taylor attended the meeting between the Plaintiffs and Betty Solomon. At the meeting, there were discussions as to who would receive what percentages from the loan. Betty Solomon stated that she could not give more than two (2) points to another outside broker because she (Betty) got one (1) point and the lender (Joe) got (1) point, which meant that the other persons would have to divide the other two (2) points. It was decided that Martin Taylor would take one (1) point and that Gary Jefferson would take (1) point which he could then split with any other referrals persons as he saw fit. After that discussion, Betty Solomon put Joe Meranda, who she introduced as the lender, on the speaker phone. While Joe Meranda was on the phone, Anthony Moore stated that they were still looking at other lenders. Betty Solomon stated that the Plaintiffs could stop looking for other lenders because they could absolutely get the project funded through World Wide and North American. Joe Meranda confirmed Ms. Solomon's statement.

46.    Until the Plaintiffs signed the Fee Agreement with Mr. Jefferson, Plaintiffs were not allowed to directly speak with Ms. Solomon. Plaintiffs entered into a Commercial Financing Written Fee Agreement with Martin Taylor on or about April 1, 2004 pledging one (1) percentage point of the loan obtained through World Wide Commercial

47.     In late March or early April of 2004, the Plaintiffs received several letters from the Defendants.  One of said letters was a list of documents that were required to process and close the loan.  Said documents, to the extent that the Plaintiffs possessed them, were immediately forwarded to Betty Solomon.

48.     Imagineight received an official letter of interest on April 3, 2004, from World Wide Commercial.  A revised copy was received on April 9, 2004.  On April 8, 2004, Imagineight signed an Advisor, Facilitator and Coordinator Service Agreement with World Wide Commercial Funding.

49.     After receiving the information from World Wide, the Plaintiffs discovered that they were required to pay an upfront closing fee prior to the issuance of a closing notice.  The fee quoted was roughly one-hundred thousand dollars ($100,000) in addition to other fees required.  Plaintiffs asked Ms. Solomon if it was possible to wrap the amount into the loan and for it to be taken off the backside of the loan. On or about March 22, 2003, Betty Solomon responded that it was not possible and that Imagineight had by the following Monday to come up with the money if they wanted to be able to obtain financing in the next round of monies that were distributed by the lender. Betty Solomon stated and continually assured the Plaintiff's that the money was refundable if any issues arose.

50.     The Plaintiffs did not anticipate needing to advance such a large amount of money on such a short notice to the lender.  Mr. Solomon, Ms. Solomon, Mr. Jefferson, Mr. Taylor nor Mr. Meranda had referenced any need to advance closing costs prior to this point.  In fact, no other lender or broker with which the Plaintiffs had spoken with had referenced necessitating such funding in advance.

51.     The Plaintiffs continued to speak with Ms. Solomon regarding the issue and, on or about April 9, 2004, Ms. Solomon stated that lender, Mr. Meranda, had made a one time offer to

accept fifty-three thousand eight hundred ($53,800) as advanced closing costs. Daniel Lundquist and Lori Lundquist raised ($50,000.00) from John and Emily Games and Jill and Jay Harris (investors) and wired the same in the amounts of $30,000 and $20,000 on or about April 12th of 2004 to Betty Solomon as a partial payment. Anthony and Melisa Moore wired the remaining $3,800 on or about May 10, 2004.

52.    On April 19, 2004, Imagineight received a Commitment Approval letter from World Wide Commercial and North American Commercial Holdings. Betty Solomon, on behalf of World Wide and North American, stated to the Plaintiffs that the Commitment Approval letter guaranteed that Imagineight would receive the loan and that Imagineight should use it (the letter) to move forward on the project. Ms. Solomon also stated that the Plaintiffs should cease their endeavors to obtain funding through other lenders because this project would be funded within 30-45 days. At the same time a letter was received directing where Imagineight should wire fees to World Wide Commercial (Bank of America) account. The account number is 003040612468 and routing number is 103000017.

53.    In the Commitment Approval letter on page two (2) paragraph four (4) it states that "The estimated time for funding for the first-tier bridge loan is thirty to forty-five 30-45 banking days from the receipt of all fees and the required documentation, which is tentatively scheduled for June 1, 2004." (The Commitment Approval letter is attached hereto as Exhibit 1 and is adopted as if fully set forth herein)

54.    On May 10, 2004, at 11:53 PM, by email Betty Solomon stated, "we are in receipt of your wire on this date and we will be re-routing the money to the lender as the final payment." At the same time, Ms. Solomon stated that she had spoken with the lender and he replied that the closing should be 30-35 days from that date, which would be around June 10 -16th. She stated that,

due to her close connections, she would speak with the lender and that she would try and get the closing date sooner, if possible.

55.    The Plaintiffs had successful full-time jobs during all times referenced above.  The Plaintiffs planned to quit their respective jobs about the time of the processing of the loan to focus their full attention to the construction and implementation of Imagineight Entertainment and Alpha Creations.  During mid-May, when questioned as to when would be a good time to quit their respective jobs to focus the full attentions towards Imagineight and Alpha full-time, taking into account that they did not have funds with which to subsist without the money from the loan.  Betty Solomon stated that around June 1, 2004, would be an opportune time as the loan would be closing around that date, maybe a little sooner or a little longer.

56.    In response to an email as to an update on a closing date, on May 20, 2004 at 1:27 PM, by email, Betty Solomon stated that "we have marked our calendars for the 11th of June, as that is exactly 30 days from the date of the receipt of the last payment of funds. We rarely ever go over 35 days for closing."

57.    On May 28, 2004, at 5:42 PM, by email, Betty Solomon stated, "we just got word from the lender, a transfer of new funds will be arriving on Monday, June 14, 2004 in the US from Europe and the lender will be closing loans all that week and the week of June 21st, and each week thereafter from this transfer of funds. Your loan will be scheduled to close the week of the 14th or the week of the 21st, however, you will get an official closing notice in a week or so as to which day is scheduled for your loan." Ms. Solomon also sent information as to where the closing would be, hotel information, driving information and air travel information.

58.    On June 5, 2004, at 12:09 PM, by email, Betty Solomon stated, "I know you are anxious for a firm date, and the Lender is working on that closing date - it looks like it will be the week of the 21st."

59.     On June 5, 2004, at 1:58 PM by email, Betty Solomon stated, "we can get your loan put in line towards the middle or the end of the week of the 21st.

60.     On June 13, 2004, at 5:23 PM by email, Betty Solomon stated, "we hope to hear from the lender this week as to the closing date." Ms. Solomon stated verbally over the phone, when she was questioned as to why a closing notice had not been issued, that the Plaintiffs should not worry about that because a closing notice may not be issued until within forty-eight (48) hours of the closing and they should be prepared at any time to receive one and prepared to immediately fly into Boston.

61.     On June 17, 2004, at 12:40 PM, by email, regarding the commission on the loan, Betty Solomon stated that she had been mistaken about the percent of the loan that the lender required. She stated that the lender actually required three (3) percent of the loan and not two (2) percent as agreed in previous documents. After reluctance on the part of the Plaintiffs, and after statements by Ms. Solomon that the lender would deny the loan without the change to the percentage, and that the loan was just about to close, the Plaintiffs were forced to agree to alter the agreement and substitute the two (2) percent language for the three (3) percent languagte.

62.     On June 18, 2004, at 6:00, PM by email, Betty Solomon stated, "I just talked to the lender and he will be working on closing notices next week for everyone."

63.     On June 21, 2004, at 8:46 PM by email, Betty Solomon stated, "we have not heard from the lender, but hope to have a date soon."

64.     On June 22, 2004, at 2:56 PM by email, Betty Solomon stated, "we are missing an appraisal for the SA property; if you do not have an MAI appraisal the lender will accept a brief appraisal for the bridge loan."

65.     The Plaintiffs were surprised as to why additional information was now being requested. The Plaintiffs had previously forwarded all documentation requested that they possessed.

Until this point, there had been no indication from anyone that more information may be required. The Plaintiffs had been told that the lender had already committed to the loan and approved such and that the only thing left was the actual closing. The Plaintiffs quickly responded and had an MAI appraisal begin the following day and brief appraisal was submitted within twenty-four (24) hours to Betty Solomon. Upon a verbal discussion, Betty Solomon stated, several times, that in no manner the MAI appraisal delay the loan and that it's necessity was only a technicality. Betty Solomon also stated, in the conversation, that such would not alter the time table for the closing.

66.     In response to a request for a time-table, on June 25, 2004, at 3:32 PM, by email, Betty Solomon stated, "I will check with the Lender to see if there is a scheduled date for your loan."

67.     On June 25, 2004, at 4:48 PM, by email, Betty Solomon stated that, "we have not talked to the lender but will try soon."

68.     On June 25, 2004, at 8:39 PM by email, Betty Solomon stated that the "MAI has been received....I just talked to the lender and upon completion of underwriting documents, Imagineight will be advised as to the closing date."

69.     By this time the architects were busily working, the construction company was making preparations and the furniture, fixtures and equipment company was looking to begin making orders. Plaintiffs had arrived upon final numbers for purchase prices on property and were looking at closing dates. Plaintiffs contacted Betty Solomon and requested when they should schedule said closing dates for as such were dependant upon the loan closing. Ms. Solomon stated that she would expedited the request to the lender so that Imagineight could close on the properties and that "it would be wise to allow 3 to 4 weeks (for the scheduled closing) to make sure that Imagineight's loan closes and that the money changes hands. Betty Solomon stated that the closing would take place in July and that as long as the closing did not occur prior to the end of July, and

that Imagineight    uld have the money in time for the closing if they set the same for late July early

August. Betty Solomon again reiterated that the MAI did not slow the process. When questioned as

to why said process was taking longer than what Plaintiffs had been informed was normal for North

American, Ms. Solomon stated that she did not know why the process was taking so long and that

this long.

70.    On June 25, 2004, at 9:18 PM, by email, Betty Solomon stated, "we do not know the

closing date; we do not think it will be next week be patient."

71.    On July 7, 2004, at 11:07 PM, by email, Betty Solomon stated that "Darrell is flying

to Boston on Monday the 12th and I am flying to Boston Wednesday July 15 –17th and I will have a

better idea then for a closing notice."

72.    Plaintiffs were subsequently informed that there was a closing backlog and that the

loan would be closed in the first week of August. Plaintiffs explained their dire situation and how

the continued delay could begin to have significantly adverse consequences on the immediate

profitability of the project and that the Plaintiffs needed a firm date on a closing. Defendant Betty

Solomon stated that she guaranteed that the would close the first week of august.

73.    Without the funding of the loan, the Plaintiffs began to run into issues with their

various creditors as July began to come to a close. Two of which were Martin Wender, the seller of

the Sea World site, and Stabach corporation, seller of the Garland site, of which the Plaintiffs had

contracted to purchase. These parties, in addition to various others, had been promised that they

would have their monies in June and then promised again in that such would occur within July.

When informed that the loan would now be closed in August, the various creditors began to doubt

the veracity of the situation.

74.    Martin Wender contacted Betty Solomon during the third week of July in order to

speak with her directly regarding the issues of the loan. Ms. Solomon stated to Mr. Wender that the

loan was "guaranteed to close" the first week in August. He explained that the property which he was selling was worth in excess of ten-million dollars ($10,000,000.00) and that he had taken the property off the market by contract with Imagineight, but that the money was now overdue. Betty Solomon unambiguously stated to Mr. Wender that the loan would occur during the first week of August and that the monies could be wired directly to Mr. Wender on the date of the closing.

75. Betty Solomon stated to Mapp Construction, Gould Evens Architects and the Morrison Companies, at the end of July, that the loan for Imagineight would be closing in mid-August of 2004.

76. After no closing in July, despite many verbal conversations and no explanation as to why such had not occurred, on August 3, 2004, at 3:57 PM, by email, Betty Solomon stated, that "I will be able to speak with the lender for only for a few minutes as he is extremely busy in getting legal documents ready for closings. One of the loans scheduled to close in August is Imagineight. You are approved Just stand by and wait." The Plaintiffs had received very similar statements for June and July without the loan being closed.

77. On August 9, 2004, at 10:55 AM, by email in response to a request for a date and regarding the fact that Ms. Solomon had made several statements guaranteeing the loan closing the first week of August, Betty Solomon stated that, "you are approved, Imagineight is scheduled to close in August, and we just have not gotten any dates yet."

78. On August 17, 2004, at 2:26 PM, by email Betty Solomon stated, "we will be having a late conference call tonight with the lender and will discuss your loan. We will be back in touch tomorrow."

79. On August 18, 2004, at 5:00 PM, by email, Betty Solomon stated that the conference call was short with the lender and that she did not have time to speak regarding the loan. She additionally stated that the lender was working on collateral and would be calling back very soon.

80.    On or about August 24, 2004, Plaintiffs received notice that the contract for the Garland site was being terminated due to the fact that no monies had been delivered per the agreement and that they could wait no longer.

81.    On or about August 31, 2004, Plaintiffs received notice that the contract for the Sea World site was being terminated due to the fact that Mr. Wender had continually been promised closing dates and he no longer believed that a loan was ever going to be processed by Betty Solomon or North American. In fact, Mr. Wender verbally stated to Daniel Lundquist that in his many years in the business, he had never seen such actions and/or inactions on the part of a Lender and that he had suspicions as to their legitimacy. Mr. Wender suggested that the Plaintiffs look into the business practices of the Defendants.

82.    The Plaintiffs entered into agreements and contracts with each of the above referenced companies, in addition to other various persons regarding purchase of commercial real-estate, all based on the express statements, promises and assurances of the Defendants. These creditors, contractors, companies and third parties expended very large sums of money based the verbal and written assurances made directly to them by Ms. Solomon and those made to the Plaintiffs.

83.    The Defendants consistently displayed an extreme failure to act in the best interests of the Plaintiffs as their agents and brokers in pursuit of obtaining financing for the project.

84.    After the Plaintiffs signed the agreement with Gary Jefferson he would not return the Plaintiffs phone calls or correspondence whatsoever. After several months of attempts, Anthony Moore finally reached Mr. Jefferson regarding the issues. Mr. Jefferson stated that he would look into the failure to fund issues and get back in touch with Mr. Moore. Mr. Moore has yet to hear anything from Mr. Jefferson regarding the matter. The only other time which Plaintiffs were able to speak with Mr. Jefferson was when Mr. Jefferson contacted the Plaintiffs wanting to

introduce them to his brother who was in the movie ticketing business in hopes that Imagineight might use him as one of their vendors.

85.     After the contract with Martin Taylor was signed, Mr. Taylor refused to assist the Plaintiffs in their pursuit of the loan, including assistance on processing paperwork.

86.     Betty Solomon was not concerned whatsoever as to the need for a timely closing. In early July, when confronted about the delay in the closing and the millions of dollars in lost revenues, Defendant Betty Solomon stated that "there will be other movies".

87.     The summer of 2005 is anticipated as being one of the largest summers to date for the movie industry. By delaying construction, there are financial losses that will never be recovered. Every dollar lost will not be regained by the Plaintiffs. Due to the anticipated superiority of design and overall theater experience, projections indicate that Imagineight Entertainment and Atlantis 20 Theaters would have significantly increased their audience size to the detriment of their competitors. Additionally, the excitement and anticipation of next summer's blockbuster movies would have provided significant exposure and the ability of Imagineight Entertainment to solidify a viewing audience and permanently convert the competition's viewers to become loyal Atlantis 20 viewers.

88.     The reputation and credit of the Plaintiffs and of Imagineight Entertainment was considered very high until their reliance on the various closing dates given by the Defendants. Since that time the Plaintiffs reputation(s) have been ruined by the Defendants actions and/or inactions. The Plaintiffs are and/or will be sued by their creditors which will make it very difficult for them to obtain future financing. The companies to which the Plaintiffs owe significant amounts of money due to their reliance on the statements of the Defendants are the exact companies which can provide the premium services required for any future endeavors. The Plaintiffs will be unable use said companies, or many others in the business, as their reputations have been ruined by the acts and omissions of the Defendants.

89.     On or about September 1, 2004, when approached about the lack of a closing notice and another request for an explanation and date, Betty Solomon stated that the lender was in Europe solidifying loans for Imagineight and other entities and that Imagineight was in line to close in late October early November. The Plaintiffs stated that such was unacceptable.

90.     During the entire process from May until September Betty Solomon consistently told the Plaintiffs that they were not allowed to contact the Lender, Joseph Merenda, directly. Betty Solomon warned the Plaintiffs that if they were to *ever* contact the Lender, Joseph Merenda, the loan process itself would be halted and that the lender would cancel the entire loan.

91.     The Plaintiffs completed all requested steps as outlined for the processing of the loan in April of 2004. Although the final three-thousand and eight hundred dollars ($3,800.00) was not advanced until May 10th the initial fifty thousand dollars ($50,000.00) was wired to Betty Solomon on April 9, 2004. Upon the full funding for the closing escrow, on or about May 10, 2004, Betty Solomon stated that there was an estimated 30 to 45 days until the close of the loan.

92.     After one-hundred and twelve (112) weekly days and eighty (80) business days without a closing notice and over a dozen promised dates, the Plaintiffs decided that the entire process had been a complete failure as that they could not get any creditable information from the lender. The Plaintiffs began to suspect that the entire process was a scam or fraud. After some preliminary investigations, the Plaintiffs discovered that Betty Solomon was presently being prosecuted by the Securities and Exchange Commission in Oklahoma, in addition to other actions, regarding fraudulent lending practices.

93.     The Plaintiffs requested verbally and in writing that Betty Solomon and Joseph Merenda return their monies and that the Plaintiffs would hold the same in trust until closing, as the Plaintiffs saw no reason why the Defendants should hold the money without any foreseeable closing

date. The Plaintiffs stated that the monies would be held in trust and that, in the event of a closing, the Plaintiffs would immediately re-submit the monies over to the Defendants.

94.     On or about September 3, 2004, Defendant Martin Taylor contacted Daniel Lundquist. During that conversation Mr. Taylor wanted to know what was going on with the Plaintiffs since they now wanted the money returned. This was the first conversation that Mr. Taylor and Mr. Lundquist had since the initial meeting. When asked about why the loan was not closing, Mr. Taylor stated that Ms. Solomon had informed him personally that every time Anthony Moore and Melisa Moore contacted Ms. Solomon regarding the loan that she would push Imagineight down on the list of closings. Mr. Taylor stated that Daniel Lundquist was the theater guy, and that he should drop Anthony Moore, start a new business and move on without him. Mr. Taylor stated that a loan could be processed almost immediately without Mr. Moore because Ms. Solomon just did not like Mr. Moore.

95.     Mr. Lundquist made a phone call to Betty Solomon on September 3, 2004, stating that he needed the money back or for the loan to close within a few weeks.

96.     On or about September 8, 2004, Betty Solomon contacted Daniel Lundquist regarding the loan. In response to the letter and previous emails, Ms. Solomon stated that she could not believe that the Plaintiffs wanted to stop the lending process as the loan was about to close. Mr. Lundquist stated that he did not want to cancel the loan and reiterated such several times. Mr. Lundquist explained that all he wanted was for the loan to be closed and to move forward. Mr. Lundquist stated that he had been hearing statements of the pending closing for months and had nothing to show that this promise would be any different. Mr. Lundquist asked Ms. Solomon exactly what the hold up was, as he could not understand the situation. Ms. Solomon stated that Mr. Moore kept bothering her about a closing date and that she did not like his attitude about the matter and that such had resulted in delays. Ms. Solomon then stated that the loan was taking longer due to

certain problems. To which Mr. Lundquist stated "such as Mr. Moore." Ms. Solomon stated "exactly."

97.    During the conversation of September 8, 2004, Betty Solomon continually attempted to convince Daniel Lundquist to cease his partnership with Anthony Moore as Mr. Lundquist had all of the experience in the industry. Ms. Solomon stated that if Mr. Lundquist were to submit a new request for funding for theaters, without Mr. Moore, such could be obtained very quickly. Mr. Lundquist stated that he was not sure he wanted to do that, but would talk with his wife about the matter. Ms. Solomon also stated that she did not want any attonrys involved in these matters as they "just cause problems and will result in loan delays". Ms. Solomon stated that she and Mr. Lundquist could resolve these matters themselves and that she would not do the deal if Mr. Lundquist continued such represented by an attorney. When asked about the monies, Ms. Solomon also inferred that the monies were in escrow at that time. As for the promise that the loan was "honestly going to close this time", Ms. Solomon stated that everything was a done deal and that the only thing she was waiting on was a closing notice. Mr. Lundquist stated that if the deal could still happen as had been planed for many months, that he hoped he would receive notice soon.

98.    On or about September 10, 2004, Ms. Solomon contact Mr. Lundquist and informed him that she had spoken with the lender and that the request for a return of any of the money would not be granted. However, that if Mr. Lundquist would agree to drop Mr. Moore and proceed himself, that the lender had agreed to waive all the advanced fees. Ms. Solomon additionally stated that, if that were to happen, she would make sure he was fast-tracked in the lending process.

99.    As of the filing of this action, none of the Defendants have closed a loan on, for and/or on behalf of any of the Plaintiffs and the Plaintiffs have suffered significant damages as a result.

## FIRST CAUSE OF ACTION
### Breach of Contract

100.     The Plaintiffs incorporate by reference paragraphs 1 through 156 as if each was fully set forth herein.

101.     The Plaintiffs, relying upon the truth of the representations made by the Defendants were induced to Contract with the Defendants. A legal and enforceable contract existed between the Plaintiffs and the Defendants. The Defendants were aware of the existence of their contractual duties and relationship with the Plaintiffs. The Defendants knowingly and intentionally breached their contract with the Plaintiffs. Defendants acted maliciously and with disregard towards their contract obligations, representations, promises and warrantees. The acts and non-performance, referenced above, on the part Defendants, was the proximate cause of the breach of contract and the Plaintiffs suffered damages caused by Defendants breach.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

102.     The Plaintiffs incorporate by reference paragraphs 1 through 156 as if each was fully set forth herein.

103.     Betty Solomon, Martin Taylor and Gary Jefferson owed a fiduciary duty to the Plaintiffs to the extent that they were the Plaintiffs agents, fiduciaries and representatives.

104.     The Defendants owed numerous duties to Plaintiff, including, but not limited to: a duty of loyalty, to act in good faith, honesty, accurate and timely reporting of information, duty to act in a reasonable, prudent and expedient manner; to act in the Plaintiffs best interest; to inform the Plaintiffs of important and/or relevant information; to act impartially; and to further the advancement of the Plaintiffs interests to the best of the Defendants abilities.

105.     Defendants failed to act in the Plaintiff's best interests or otherwise breached their fiduciary duties. Defendants were reckless, careless and negligent in carrying out their duties.

106.     Defendants knowingly, intelligently and purposefully disregarded the Plaintiff's best

interests in carrying out Defendant's duties as agents, fiduciaries and representatives.

107.    The duties owed to Plaintiff were breached and as a result, Plaintiffs suffered damages caused by Defendants breach of their fiduciary duties.

## THIRD CAUSE OF ACTION
### Fraudulent Inducement of contract

108.    The Plaintiffs incorporate by reference paragraphs 1 through 156 as if each was fully set forth herein.

109.    The Defendants' made false statement concerning material facts to the transactions referenced herein.

110.    Defendants' had knowledge of the statements, promises, averments, declarations, and assertions falsity or had an utter disregard for their truth. The Defendants' made said statements, actions, inactions, promises, averments, declarations, and assertions with the intent to induce reliance thereon.

111.    Plaintiff, under the circumstances, manifested a reasonable right to rely on the statements, actions, inactions, promises, averments, declarations, and assertions. The Plaintiff, relying upon the truth of the representations was induced into contracting with the Defendants and detrimentally relied thereon

112.    As a result of the Plaintiffs detrimental reliance on the Defendants' statements, actions, inactions, promises, averments, declarations, and assertions the Plaintiffs were induced to contract with the Defendants and sustained damages therefrom.

## THIRD CAUSE OF ACTION
### Fraud and Deceit

113.    The Plaintiffs incorporate by reference paragraphs 1 through 156 as if each was fully set forth herein.

114.    At the time the Defendants statements, actions, inactions, promises, averments,

declarations, and assertions referenced herein, Defendants knew, or otherwise should have known, that these statements were false or made without present intent to deliver upon the statements, actions, promises, averments, declarations and assertions.

115.    Believing the statements, actions, inactions, promises, averments, declarations and assertions, the Plaintiffs relied upon such to their detriment.

116.    In reliance upon the statements, promises, averments, declarations, assertions and representations made by Defendants, the Plaintiffs acted or failed to act to Plaintiffs' detriment and the Plaintiffs have sustained substantial damages as a result.

## FOURTH CAUSE OF ACTION
### Fraudulent Misrepresentation

117.    The Plaintiff incorporates by reference paragraphs 1 through 156 as if each was fully set forth herein.

118.    Defendants made statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts in their dealings with the Plaintiff. The representations were false.

119.    The Defendants made the statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts without exercising reasonable care.

120.    The statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts were made with the intent to induce the Plaintiffs to rely upon them.

121.    At the time the Defendants made the statements, actions, inactions, promises, averments, declarations, and assertions, Defendants knew, or otherwise should have known, that these statements were false or made without present intent to deliver upon such.

122.    Believing the statements, actions, inactions, promises, averments, declarations and

assertions, the Plaintiffs relied upon such to their detriment.

123.    Plaintiffs were unaware of the falsity of the representations and acted in justifiable reliance upon the truth of the representations.

124.    The Plaintiff, relying upon the truth of the statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts, was induced into contracting with the Defendants.

125.    Upon information and belief Plaintiffs allege that the Defendants had no present intention to perform the statements, representations, promises, averments, declarations, and assertions made to the Plaintiffs and, in fact, Defendant did not perform as promised.

126.    As a result, Plaintiffs suffered substantial damages.

### FIFTH CAUSE OF ACTION
### Negligent Misrepresentation

127.    The Plaintiffs incorporate by reference paragraphs 1 through 156 as if each was fully set forth herein.

128.    Defendants made statements, representations, promises, averments, declarations, and assertions to past and/or existing material facts in their dealings with the Plaintiffs. The representations were false.

129.    The Defendants made the statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts without exercising reasonable care.

130.    The statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts were made with the intent to induce Plaintiffs to rely upon them.

131.    Plaintiffs were unaware of the falsity of any of the statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts made by

Defendants and acted in justifiable reliance upon the truth thereof.

132.    Plaintiff alleges upon information and belief that Defendants had no present intention to perform the promises made to the Plaintiff and, in fact, Defendant did not perform as promised.

133.    As a result, Plaintiffs suffered substantial damages.

## SIXTH CAUSE OF ACTION
### Intentional Misrepresentation

134.    The Plaintiff incorporates by reference paragraphs 1 through 156 as if each was fully set forth herein.

135.    Defendants made statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts in their dealings with the Plaintiffs.

136.    The representations were false.

137.    The Defendants made the statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts without exercising reasonable care.

138.    The statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts were made with the intent to induce the Plaintiffs to rely upon them.

139.    The Defendants made the statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts with intent to defraud the Plaintiff

140.    Plaintiff was unaware of the falsity of any of the statements made by Defendants and acted in justifiable reliance upon the truth thereof.

141.    Plaintiff, relying upon the truth of the statements, representations, promises, averments, declarations, and assertions to past, future and/or existing material facts, was induced into contracting with the Defendants and beginning business operations.

142.    As a result, Plaintiffs suffered substantial damages.

## SEVENTH CAUSE OF ACTION
### Breach of Principle-Agent Relationship

143.    The Plaintiffs incorporate by reference paragraphs 1 through 156 as if each was fully set forth herein.

144.    Defendants stood in a confidential relationship with the Plaintiff.

145.    Defendants breached their duties as Plaintiff's agent and fiduciary. Defendants failed to act in the Plaintiff's best interests. Defendants were reckless, careless and negligence in carrying out their duties as agent and fiduciary. Defendants knowingly, intelligently and purposefully disregarded the Plaintiff's interests in carrying out Defendants duties as agent and fiduciary.

146.    As a result, Plaintiff suffered substantial damages.

## EIGHTH CAUSE OF ACTION
### Unfair or Deceptive Acts or Practices/Consumer Protection

147.    The Plaintiffs incorporate by reference paragraphs 1 through 156 as if each was fully set forth herein.

148.    As a proximate result of the violation of the Consumer Protection Acts by the Defendants, the Plaintiffs have been damaged.

149.    The actions, inactions, statements, representations, promises, averments, declarations, and assertions made by the Defendants to the Plaintiffs were unfair and/or deceptive acts and practices.

150.    The employment of the deceptive acts by the Defendants was a willful and knowing violation of the Consumer Protection Acts.

151.    As a result of the violation, Plaintiffs suffered substantial damages.

## NINTH CAUSE OF ACTION
### Outrageous Conduct

152.    The Plaintiff incorporates by reference paragraphs 1 through 156 as if each was fully set forth herein.

153.     The conduct of the Defendants, referenced above, was intentional and reckless.  The conduct of the Defendants was so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

154.     The Defendants conduct resulted in serious mental injury to the Plaintiffs.

## TENTH CAUSE OF ACTION
### SPECIFIC PERFORMANCE

155.     The Plaintiff incorporates by reference paragraphs 1 through 156 as if each was fully set forth herein.

156.     Plaintiff has a right to of the contract between the parties for lending purposes.

Wherefore, Plaintiff requests judgment against defendants, and each of them, for:

1. Compensatory damages in the sum of $155,000,000.00;

2. Punitive damages in the amount of $100,000,000.00;

3. Specific Performance of the contract and loan;

4. Reasonable attorney fees;

5. Costs of this action;

6. For treble damages pursuant to the provisions provided within the Consumer Protection statutes.

7. Such further relief as the Plaintiff may prove entitled or the court may deem just and equitable.

Respectfully submitted, this 7 day of _Feb._ 2004.

Respectfully submitted,

Nathan E. Anderson
Tennessee BPR #023216

Alvin S. Nathanson
BBO # 367480
Nathanson & Goldberg, P.C.
Two Oliver Street
Boston, MA 02109

7019 Asheville Hwy,
Knoxville, TN 37924
(865) 329-3000

## AFFIDAVIT OF DANIEL LUNDQUIST

I, DANIEL LUNDQUIST, having been duly sworn according to the law, do hereby affirm that I have read the contents of the foregoing COMPLAINT, and that the statements contained therein are true and correct to the best of my knowledge, and that this COMPLAINT is brought for no improper purpose, but in truth and sincerity for the purposes described therein.

_____
Daniel Lundquist
Affiant

Sworn to and subscribed before me this _2_ day of _Dec_____, 2004.


_____
Notary Public

My commission expires: _July 28, 2008_

> MICHELLE A. ONG
> Notary Public - Notary Seal
> STATE OF MISSOURI
> St. Charles County
> My Commission Expires: July 28, 2008

## AFFIDAVIT OF LORI LUNDQUIST

I, LORI LUNDQUIST, having been duly sworn according to the law, do hereby affirm that I have read the contents of the foregoing COMPLAINT, and that the statements contained therein are true and correct to the best of my knowledge, and that this COMPLAINT is brought for no improper purpose, but in truth and sincerity for the purposes described therein.

_____
LORI LUNDQUIST
Affiant

Sworn to and subscribed before me this _2_ day of _Dec_____, 2004.

_____
Notary Public

My commission expires: _July 28, 2008_

> MICHELLE A. ONG
> Notary Public - Notary Seal
> STATE OF MISSOURI
> St. Charles County
> My Commission Expires: July 28, 2008



**EXHIBIT**

**#** 1

# WORLDWIDE COMMERCIAL FUNDING, INC.



14788 South May Avenue, Oklahoma City, OK 73170 • Phone: (405) 692-5279 • Fax: (405) 692-5295

E-mail: darrell@wwfunds.com • E-mail: boyle@wwfunds.com • E-mail: kate@wwfunds.com

Web site: http://www.wwfunds.com

Advisor & Consulting Services • Direct Commercial Lending Source • Financial Solutions

**Borrower:**                                                                                      April 19, 2004

Mr. Daniel Lundquist, CEO
Mr. Anthony Moore, President and Melissa Moore
Imagineight Entertainment, Inc.
127 Shanandoah Lane
Murphy, TX 75094

Phone: (469) 366-6272
E-Mail: <dilldl@aol.com> and <tonym321@comcast.net>

## COMMITMENT APPROVAL

**THIS Commitment** constitutes the intent for interim financing (the "Loan") from the Lender **NORTH AMERICAN COMMERCIAL HOLDINGS, LLC,** (hereinafter referred to as "NACH") the Lender, and/or its Affiliates) and in behalf of the Lender, **Worldwide Commercial Funding, Inc.** who has been authorized to issue this Commitment to the following party so named:

### IMAGINEIGHT ENTERTAINMENT, INC.
**Daniel Lundquist, CEO, Melissa Moore, and Anthony Moore, President**

**PURPOSE:** To provide financing to the Borrower for the purpose of disbursing interim funds through the Lender's two-tier financing program in order that the initial operations can commence for the project through the first-tier financing which involves the acquisition of the land for the four locations (or deposit on the land), and working capital for the project. The second-tier financing will provide financing to finalize the acquisition of the properties, and construction financing to commence the "Atlantis Stadium 20 Theatres" for all phases of the project for a net $82,000,000, which consists of the initial four locations {two locations in San Antonio, Texas, one location in Allen, Texas and one location in Austin, Texas}. Per the direct lender's notification and authorization, the following are outlined terms to the Borrower from the Lender's "exclusive facilitator," Worldwide Commercial Funding, Inc.

Financing will be provided for the second-tier financing subject to proven due diligence confirming the results of the final narrative MAI appraisals on all properties utilized as collateral, formal business plan which will include architectural plans and design, feasibility study, market analysis

report, business evaluation report, environmental reports, engineering reports, including studies provided by Borrower's submissions, and final committee approval of satisfactory legal documentation provided.

**Estimated Loan:**     **First Tier Loan – Gross $8,000,000 –(interim bridge loan)**
                            **Second Tier Loan - Net $82,000,000 deducting $8,000,000**

**Use of Proceeds:**     Funds are to be used for the development and construction of the "Atlantis Stadium 20 Theatres" at four Texas locations, as outlined in your formal request for financing.

**Disbursement:**     **First Tier Loan:** Financing will be provided to the Borrower for a bridge loan in the gross amount of $8,000,000 {an estimated net amount of $5,065,000 disbursed to the Borrower at closing and the remaining funds of $2,376,000 are to be used to pay the Seller direct for the deposit on one of the properties in San Antonio}. If other properties are negotiated with a firm Purchase & Sale Agreement signed between the Seller and Buyer, these deposit funds will be disbursed to the seller of that property at closing also for the remaining three properties under negotiation.

                  The funds disbursed to the borrower at closing are to provide working capital for land acquisitions for the project, and funds to be used for the submission of a revised formal business plan reflecting architectural renderings, projections, use of proceeds, construction budgets, builder contractor's credentials and performance bond, environmental reports, feasibility studies, market analysis studies, business evaluation report, demographics, etc. for the main loan document requirements. The interest rate for the first tier interim bridge loan will be assessed at an estimated seven percent (7%) interest rate, with monthly principal and interest payments payable until the major loan is funded. **The estimated time for funding for the first-tier bridge loan is 30 to 45 banking days from the receipt of all fees and the required documentation, which is tentatively scheduled for June 1, 2004.**

                  **Second Tier Loan (Major Loan):** Funding for the major loan of an estimated net amount of $82,000,000 will merge with the first tier loan of $8,000,000 and pay off the interim bridge loan. Then, the final underwriting process will commence for the major loan which will take approximately 90 to 120 days from the date of funding the bridge loan, and the funds from the major loan will be disbursed for the final purchase and acquisition of the properties, along with first draw funds in accordance to a draw schedule submitted by the Borrower. The initial closing disbursement, net of all fees and expenses will be funded per the draw schedule over the development and construction period of three to five years. The net Loan proceeds from the Closing Draw shall be used solely for the development and construction of the project,

involving the project per a defined use of proceeds, construction budgets, etc.

**Loan Documents:** Shall mean the Note, Assignment of Life Insurance, Collateral Mortgage, Security Agreement, Subordination Agreement, and any other document executed and delivered by the Borrower or any Guarantor to evidence or secure the Loan.

**Development and Construction Financing Process:** After the Bridge Loan has been finalized and the collateral properties' deposit paid, the major loan will immediately commence the full underwriting process which involve the evaluation, analysis of all reports, studies, and documents required to be submitted by the Borrower. Upon funding the major loan, and during the development and construction phase (development and construction financing) the interest rate shall be based on "The Index Adjustment Rate" and/or percentage points and the ten year Treasury rate as published by the Wall Street Journal under the heading "Money Rates." The minimum rate of interest shall not be less than the initial rate of interest and shall be fixed at closing based on the index quoted on that date. The interest rate shall be amortized for a period of ten (10) years and is based on disbursements in accordance to the draw-down schedule until completion and issuance of any occupancy permits before converting to a permanent mortgage.

**Permanent Financing:** The Interest Rate for permanent financing shall not exceed the aggregate designated points "The Index Adjustment Rate," or the percentage points and the ten year Treasury rate as published by the Wall Street Journal under the heading "Money Rates". The minimum rate of interest shall be less than the initial rate of interest for the development and construction interim financing. The rate of interest shall be a fixed rate and set at closing based on the index quoted on that date. Regular monthly payments of principal and interest shall be paid during the term of the loan, and amortized for a period of twenty (20) to twenty-five (25) years, as defined by the Lender.

**Proposed Collateral:** Three Real Estate Properties submitted for the four locations will provide security collateral for payment of the Obligations, Expenses and any other obligations of the Borrower to the Secured Party. The Borrower shall grant to the Secured Party as security in First mortgage position will include without limitation the four real properties consisting of the land where the facility is to be constructed, etc. The Borrower and the property owners shall grant to the Secured Party a continuing lien upon and security interest in all collateral owned.

**Collateral Property:** The Collateral Properties shall be and remain free and clear of all liens or encumbrances after the payoff to the first lien holder from the first-tier financing with the Lender in first position as lien holder on the four

properties as shown therein. For the Second-Tier Financing for the major loan, the Borrower shall submit to the Lender, the following:

(1) **Appraisals** - Subject to a full narrative MAI appraisal on each of the properties to be utilized for collateral in with a minimum fair market value to be reflected in these appraisals.

(2) **Liens** - Subject to any liens, judgments, etc. on said properties to be acquired and/or land to be donated or acquired for the project.

(3) **Required Documentation for Second Tier Financing** - Subject to all required documentation, reports, studies, revised business plan with architectural renderings, projections, use of proceeds, construction budgets, builder contractor's credentials and performance bond, environmental reports, feasibility studies, market analysis studies, environmental reports, engineering, business evaluation report, demographics, etc. for the main loan document requirements.

**Documentation Fee:** Final review and compilation of conditions will be subject to a document preparation fee (to be determined) as part of the final closing costs.

**Guarantors:** Borrower

**Loan Process:** **First Tier Bridge Loan** - A satisfactory review of the appraisals on the four properties as collateral to secure the loan will be reviewed by the Lender, after the review completed and these appraisals have proven to be acceptable for the first-tier financing. In addition, the Lender reserves the right to send a representative to make an on-site visit to the collateral properties for satisfactory results to be presented to the Lender as to the appraised value declared.

A closing date will be scheduled and a Title Company and/or Attorney who will be assigned to handle the closing of the First Tier Bridge Loan. All Loan documents will be forwarded to the Title Company and to the representing attorney for payment in full to the Sellers of the properties per each Sale and Purchase Agreement submitted, from the proceeds at closing, with instructions from the Lender to disburse funds in payment from the proceeds of the bridge loan to each of the sellers of the four properties as deposits on the four respective properties as reflected in the submitted documentation; and the remainder of the bridge loan funds to be disbursed to the Borrower at closing. These funds will be wired by the Lender to the Title Company or Escrow Attorney for distribution to the Borrower at the time of closing,

utilizing the three-day period for Lender to file appropriate documents for title filing on the four properties.

**Transfer of Assets:**    Borrower/Guarantor shall not transfer, reinvest or otherwise dispose of Borrower's assets in a manner or to an extent that would or might impair Borrower's ability to perform her obligation under the Guaranty.

1. It is agreed and understood that the Borrower shall pay the closing costs as per this agreement of One Hundred Fifty Thousand Dollars ($150,000) for the bridge loan expenditures, which consists of the expenses associated with this transaction incurred by the Lender and/or its legal representatives as it pertains to the preparation of relevant documents related hereto, and the Borrower will comply with the following terms, covenants, and conditions as required and set forth under the terms of this Loan Agreement:

2. It is understood that the Borrower agrees to pay from the proceeds of the first-tier bridge loan, the commissions of a total of five points (5%) to be deducted from the gross proceeds of the bridge loan (first-tier) for commissions, etc., as reflected on the chart, then the deposit payments to the Sellers are paid on the four properties submitted as collateral to secure the loan and other expenses involving the commissions, etc.

3. Promptly upon the execution of this commitment, Lender, Facilitator and Borrower shall diligently work towards closing this Loan as soon as practicable. Lender estimates that the closing of the Loan shall occur *within thirty (30) to forty-five banking days* after the date of mutual execution and final wire of remaining fees, delivery of this document ensuring consummation of all terms and covenants set forth by this "Commitment" which is tentatively scheduled to be *"on June 1, 2004."*

4. The Lender's obligation to make the Loan shall be subject to the satisfaction of (i) all matters set forth in this Commitment Letter, (ii) execution, delivery and, when appropriate, recording or filing of the Collateral Mortgage and Security Agreement and financing statement related to the Collateral Mortgage and Security Agreement, and (iii) approval by the Lender and its counsel of all legal and financial matters related to the Loan.

5. The Borrower agrees to notify the Lender to changes in form that (i) transfer or dispose of all or a substantial portion of its assets, (ii) participate in any merger, consolidation or other absorption, (iii) acquire substantially all of the assets of any other entity, (iv) do business under or otherwise use any name other than its true name, (v) make, terminate or permit to be revoked any election pursuant to tax status previously approved, and enforced, by the Internal Revenue Code and/or other regulatory agencies having jurisdiction thereof, or (vi) make any material change in its business, structure, purposes or operations that might have a material adverse effect on the Borrower.

6. "Default" under this Agreement shall exist if any certificate or document rendered, representation, warranty or financial statement furnished by or on behalf of the Borrower pursuant to or in connection with this Agreement (including, without limitation, representations and warranties contained herein) or as an inducement to the

Lender to enter into this Agreement or any other lending agreement with the Borrower shall prove to have been false in any material respect at the time as of which the facts therein set forth were certified, or to have omitted any substantial contingent or unliquidated liability or claim against the Borrower, or should the Lender receive documentary evidence that the Borrower willfully misrepresented inherent facts that a loan was not otherwise available to the Borrower on terms and condition which would permit completion and/or successful operation or accomplishment of the activities to be financed with the Loan, or if on the date of execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed by any such statement or certificate, which change shall not have been disclosed by the Borrower to the Lender at or prior to the time of such execution.

7.  This loan shall be further contingent upon there not existing a definite Closing Date, but a tentative closing date of June 1, 2004, at the time of execution but (i) any event or condition that we reasonably believe would or might have a material adverse effect on you or on your business, rendered any collateral or guaranty less valuable than we had previously determined it to be or cause us to deem ourselves insecure in having the loan close, or (ii) any change in law or regulation which prevents or prohibits the funding, or (iii) as a contingency the withholding of pertinent information to this Agreement evidencing and securing the proposed mortgage loan in form and substance satisfactory to us and our counsel containing such representations, warranties, conditions, covenants, defaults, and remedies as customary in transactions of a similar type.

8.  Each party hereto acknowledges its full understanding of this Agreement, that there are no verbal promises, undertakings or agreements in connection herewith and that this Agreement may be modified only by the written agreement signed by the parties hereto.

---

**NOTICE: This Commitment, which is not assignable by you, shall automatically expire and be null and void if (i) we have not received a copy of this Commitment letter executed by you, as set forth above, on or before April 26, 2004, (ii) prior to any such receipt we, orally or in writing, give notice of withdrawal hereof; or (iii) we extend the expiration date, in our sole discretion, provided such extension is in writing and, if so extended, from the date of this Commitment, and (v) when properly executed by all parties.**

---

**Acknowledged, Accepted and Agreed** to all of the preceding terms and conditions of this Commitment as of this 19th day of April, 2004.

## IMAGINEIGHT ENTERTAINMENT, INC.

By: _Anthony Moore, President_
    Anthony Moore, President

***In Behalf of the Lender: North American Commercial Holdings, LLC
And/or its Affiliates***

By:
**WORLDWIDE COMMERCIAL FUNDING, INC.,** and/or its Affiliates
(An Oklahoma Corporation)
*Appointed Facilitator for the Lender, North American Commercial Holdings, LLC*

**Darrell Solomon, President**
**Chief Financial Officer**

April 19, 2004

**FACSIMILE TRANSMISSIONS ARE ACCEPTABLE AND BINDING BY ALL PARTIES**

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

Imaginehit Entertainment, Daniel and Lori Lundquist, John and Emily Games, Jay and

**DEFENDANTS**

North American Commercial Holdings, World Wide Commerical Funding, Betty Solomon, Joe Meranda, Darrell Solomon, et al.

(b)  County of Residence of First Listed Plaintiff    **Dallas, Texas**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    **Middlesex, MA**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Anderson & Long, LLP, 7019 Asheville Hwy., Knoxville, TN 37924

Attorneys (If Known)

05 - 10790 PB

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN    (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 Section 1332

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE    None    DOCKET NUMBER

DATE    March 31, 2005

SIGNATURE OF ATTORNEY OF RECORD    Steven S. Nathanson /cox

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Imagineight Entertainment, Inc._
   _vs. North American Commercial Holdings_

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

   ___ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ___ II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.       for patent, trademark or copyright cases

   _X_ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

   ___ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

   ___ V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   _N/A_

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)                                                                       YES ____  NO _X_

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?                        YES ____  NO _X_

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?   YES ____  NO _X_

7. Do **all** of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).                                                                                                     YES ____  NO ____

   A.   If yes, in which division do **all** of the non-governmental parties reside?

        Eastern Division            Central Division                    Western Division

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division            Central Division                    Western Division

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)                                     YES ____  NO ____

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME _Nathan E. Anderson_

ADDRESS _7019 Asheville Hwy., Knoxville, TN 37924_

TELEPHONE NO. _(P65) 329-3000_